---
Vail *v.* Vail.
---

NEW-YORK SPECIAL TERM, Nov. 1849. *Edmonds*, Justice.

HENRY VAIL and others, surviving ex'rs of Laurent Salles, *vs.* JULIA VAIL and others.

A testator died, leaving a widow, and six children, some of whom were infants. By his will, executed since the revised statutes took effect, the testator, after giving various pecuniary legacies, directed his executors to invest $25,000 of his personal estate for the use of his wife, during her life or widowhood, with liberty to her, if she died his widow, to dispose of the same by will, among his children or grandchildren; and if she died without making such disposition, then that the principal should sink into the general residue of the estate. He also directed $10,000 to be invested for the use of his daughter Mrs. T. for life, with remainder to her two children, or the survivor of them; and if they should both die in the lifetime of their mother, then to such persons as she might by will appoint, or in default of such appointment, that the principal sum should sink into the general residue. The executors were also directed, from the income of his estate, to provide for the support and education of his minor children, until they should respectively arrive at the age of 21 or be married. The testator also gave to each of his five daughters a legacy of $25,000; those to the married daughters to be paid immediately, and those to the others at the age of 21 or sooner, if they should marry with the consent of the executors. He

---

Vail *v.* Vail.

---

also gave to each daughter a legacy of $25,000 payable at the age of 25 years. These several legacies were to be paid to the issue of such of the daughters as should die before the same became payable, provided they had any issue living at the time when such payment was to be made; otherwise the legacy was to fall into the general residue. The testator also gave to his son three legacies of $25,000 each, payable at the ages of 21, 25 and 27. The executors were directed to invest the whole of the personal estate of the testator, except so much as might be necessary to fulfil the requisitions of the will, in their own names for the use and benefit of the testator's children, in the purchase of real estate, or in bonds and mortgages, &c. And when the youngest child should arrive at the age of 25, or as soon thereafter as the widow should die, the executors were directed to sell all the real estate, and then to divide all that remained of the estate among the six children and their issue, in such proportions as to equalize, with interest, the previous advances made by the executors; so as to give to each child an equal benefit from the estate. But this distribution was to be made without reference to the legacy of $10,000 to Mrs. T. and her children, or to any disposition which the widow might make of the $25,000 legacy to her. The testator further directed that the several shares so apportioned should be invested in the name of the executors, as trustees for his children respectively, and that the income should be paid to the children for life. And that the portion of each child, after his or her death, should go to his or her issue, if any, and if none, then to be divided among the surviving children, and the issue of such as had died, *per stirpes;* or in such other manner as the child dying without issue might direct.

*Held,* 1. That although there was no express devise to the executors, yet that a trust was vested in them by implication, for the purposes of the will; a trust being necessary in respect to the real estate, to enable the executors to receive and expend the rents and profits, and as to the personal estate, it being necessary to effectuate the intention to accumulate. And that during the continuance of such trust, the legal estate held by them was inalienable, either by the trustees or by the *cestuis que trust;* at least until the youngest child should attain the age of twenty-one years.

2. That as such trust would not terminate until the expiration of four minorities, the limitation was too remote, as suspending the ownership beyond the termination of two lives in being, and therefore void.

3. That it being manifestly the intention of the testator to have all his estate converted into personal property, before its final distribution among his children, upon the principles of equitable conversion the whole estate was to be regarded as personal property.

4. That although the statute in regard to uses and trusts does not apply to personal property, yet that the statute respecting future estates in lands is applicable; and that under that statute the express trust commencing on the final division of the property among the testator's children was void.

5. That the ultimate disposition of the estate of the testator, in the will, was void; and that as to the residuum, the testator died intestate.

It is now well settled, especially in regard to trusts of personal property, that

Vail v. Vail.

where personal estate is vested in trustees upon various trusts, some of which are valid and others void, the courts must separate those which are legal and valid, if they can be separated, from those which are illegal and void.

The judgment or decree of a court possessing competent jurisdiction is final, not only as to the subject matter thereby determined, but as to every other matter which the parties might litigate in the cause, and which they might have had decided.

But a former decree, to be a good bar, must have been between the same parties, and for the same subject matter.

Effect of a marriage contracted in France, under the *dotal system*, upon the rights of the husband in the property of the wife, in case of his surviving her.

IN EQUITY. The bill in this cause was filed to obtain the decision and direction of the court as to the construction of certain parts of the will of Laurent Salles, deceased. The testator died in 1833, leaving property of the value of about twelve hundred thousand dollars, one hundred thousand of which was in real estate, and the residue was in stocks, bonds and mortgages, and other personal property. The testator left a widow about 47 years of age, and six children, the eldest of whom was 26 years of age, and the youngest fourteen. By his will, which was made after the revised statutes went into operation, the testator bequeathed about $15,000 in legacies, to some distant relatives and friends, and to charitable objects. He then directed $25,000 of his personal estate to be invested for the use of his wife, during her life or widowhood, with liberty to her if she died his widow, to dispose of the same, by will, among his children or grandchildren; and if she died without making such disposition, then that the principal, upon her death, should sink into the general residue of his estate. He also directed $10,000 to be invested for the use of his daughter, Mrs. Tonnele, for life, with remainder to her two children, or the survivor of them; and if they should both die in the lifetime of their mother, then to such persons as she might by will appoint, or in default of such appointment, that the principal sum should sink into the general residue. The testator also ordered the executors, from the income of his estate, either real or personal, to pay and appropriate such sums as might be necessary for the support and education of his minor children, until they should respectively

Vail *v.* Vail.

arrive at the age of twenty-one, or be married. He also gave to each of his five daughters a legacy of $25,000; the legacies to the married daughters to be paid immediately, and those to the other three to be paid at the age of twenty-one, or sooner, if they married with the consent of the executors. He also gave to each daughter a similar legacy of $25,000, payable when they should respectively attain the age of 25 years. These several legacies were to be paid to the issue of such of the daughters as should die before the same became payable, provided they had any issue living at the time when such payment was to be made; and if they had no such issue, the legacy was to fall into the general residue. The testator also gave to his son three legacies, of $25,000 each, the first payable when he was twenty-one, the second when he was twenty-five, and the third when he was twenty-seven. The executors were directed to invest the whole of the personal estate of the testator, except so much thereof as might be necessary to fulfil the requisitions of the will, in the name of the executors, for the use and benefit of the testator's children, in the purchase of real estate, or in bonds and mortgages, or in certain other permanent securities specified in the will. And when the youngest child arrived at the age of twenty-five, or as soon thereafter as the widow should die, and not before, the executors were directed to sell all the real estate of which the testator died seised, and also that which should have been purchased by them, and then to divide all that remained of his estate among the six children and their issue in such proportions as to equalize, with interest, the previous advances which should have been made by the executors, as directed in the will; so as to give to each child an equal benefit from his estate. This distribution was to be made, however, without reference to the legacy of $10,000 to Mrs. Tonnele and her children, or to any disposition which the widow might make of the principal of the $25,000 legacy to her. The testator further directed that the several shares so apportioned should be invested in the name of the executors, as trustees for his children respectively, and that the income should be paid to the children for life. And he directed that the portion of each child,

after his or her death, should go to the issue of such child, if any there was, and if none, then to be divided among the surviving children, and the issue of such as had died, *per stirpes;* or in such other manner as the child dying without issue might by will direct.

Answers had been put in for all the defendants, and it was now insisted that the devise of the residuum was totally void, and that such residue should be distributed among the next of kin by reason of the intestacy *quoad hoc:* that the widow of the testator having married a second time to a M. Morin, in France, and dying, her share in such residue belonged to such second husband, and not to her next of kin, and that the decree in the suit of *Vail* v. *Vail,* reported in 4 *Paige,* 317, was a bar to the relief sought in this suit.

*G. T. Strong,* for the plaintiffs.

*C. W. Sandford,* for the defendants Aaron Vail, &c.

*R. Emmett,* guardian ad litem for infant defendants.

*L. B. Woodruff,* for the defendants De Alfaro, &c.

EDMONDS, J.   Although there is no express devise to the executors, in the will, yet I entertain no doubt that a trust is created by it.

1. As to the devise of $25,000 for the use of testator's wife. The executors are to set it apart, and keep it invested for her use, and to pay her the interest *durante viduitate,* with a devise over in case of her death or marriage.   In one event it is to go into and form part of the residuum.   The legal estate in this sum must necessarily be vested in the executors, while the absolute ownership is thus suspended, and if in them, must be held by them as trustees, for the purposes of the will.

2. As to the devise of $4000 for Francis Youett.   The executors are to invest it—in their own names of course—and pay the interest to him for life, with a disposition over.   Until his death,

the executors are to hold the principal in trust for his use, and then to pay it over.

3. The education and support of minor children. This is to be paid for out of the income of his estate, real or personal, until the purpose required is answered, and necessarily involves an ownership in the executors; for it gives them an absolute disposition of the rents, issues and profits, until a certain period, and by virtue of the devise they are entitled to the actual possession and the receipt of such rents and profits. (1 *R. S.* 727, § 47.)

4. The devise of $10,000 for Cecile Tonnele. The principal is to be invested, the income paid her during life, with a disposition over of the principal on her death: in one event it may go into the residuum. Here also is a trust, necessarily, with the legal estate, vested in the executors.

5. The devise of the whole personalty. It is to be invested by the executors in their names as such, but for the use and benefit of his children, in the purchase of real estate, or in certain specified securities, for the purposes of the will. Thus the executors become seised of the legal estate in the whole personalty, in trust for the purposes of the will. There is no devise of the income of the personalty, except as before mentioned, for the education and support of minor children, and to pay over the income of part to Mrs. Salles, Mr. Youett and Mrs. Tonnele; but there is a devise to the executors, of something more than a mere power to sue; they are to convert a part from personalty into realty, and finally the whole into personalty, and to make partition, and on such partition to invest each child's share in their names as trustees, and pay the income during their lives, and the principal as directed, on their deaths. So that the executors become seised of the legal estate, not only from the necessity of the case, but because they are for a period to receive the rents, issues and profits.

6. The disposition of the personalty. To each of his five daughters, $50,000 at the times specified; such times, in a degree depending on a contingency, and the exercise of a discretion in the executors, and the ultimate payment of the principal

Vail *v.* Vail.

sum depending upon a contingency, in the failure of which, these sums, or part of them, may go into the residuum. And until all attain the age of twenty-one, the executors must be seised of the legal estate, in trust for the purposes of the will.

7. The disposition of the residuum. As soon as practicable after the youngest child becomes twenty-five, in case of the widow's death, the executors are to make equal partition. On such partition, a trust is created in the executors; for they are expressly directed to invest each one's share of the residuum, in their names as trustees for the children respectively, the income to be paid to the children during their lives, with a disposition over on their deaths. So that it seems to me that every step in the execution of the will, from its first being admitted to probate until the death of the testator's widow and all his children, involves of necessity the existence of a trust in the executors in some form or other, and to some extent.

If there is a trust, the question occurs, is it a valid one? Neither the absolute power of alienation of lands, nor the absolute ownership of personal property, can be suspended by any limitation or condition whatever, for a longer period than during the continuance of two lives in being at the creation of the estate, or which is the same thing in this case, at the death of the testator. (1 *R. S.* 723, § 15. *Id.* 773, § 1.) By tracing the various devises of this will, through the several steps which they may take in their progress to a final and absolute ownership, it will very readily be discovered whether any portion of the estate may be suspended for more than two lives in being at the testator's death.

1. As to the devise of $25,000 to the widow. In the first instance, the income is given to her during her life, or widowhood, with the power during widowhood, of devising the principal sum to her children or grandchildren. But in case of her death or remarriage, it shall revert to and be a part of his personal estate.

Thus, until this sum shall again flow into the general reservoir of the personal estate, one life estate in it is created. Whether, after it shall have again thus mingled with the resi-

duum, any more than that life estate is created, will be presently examined.

2. As to the devise of $10,000 to Mrs. Tonnelle. This also may, in case she die, surviving her two children, and without a will, flow into and form part of the residuum, but in the mean time, there has been one life estate—hers, namely—carved out of it. Whether any more than that one, will also be presently considered.

3. As to the $250,000 devised to the five daughters. The whole of this may, in case of the death of all the daughters without issue, remain in and form part of the residuum, and so may each separate bequest of $50,000 given to each, but not until each sum of $50,000 shall have been first subjected to at least one, and as we shall by-and-by see, to perhaps more than one life estate.

4. As to the devise of $75,000 to the son. This is given absolutely to the son, and is subject to no devise over in case of his death. No life estate whatever is carved out of it, the absolute ownership being given to him in the first instance.

5. As to the real estate. When the youngest child shall attain the age of 25, it is to be converted into personalty, and flow into the residuum.

6. As to the residuum. Thus all the estate, real and personal, of the testator, except the devises to his son, to Mr. Youett, to his relatives in France, and to the two charitable societies named in the will, must or may flow into and form part of the residuum. Is such residuum so devised that several successive estates for life may be carved out of it? It is to be divided into six parts, and each part is to be invested by the executors in their names, as trustees for the several children of the testator; the income and profits of the several parts are to be paid to each child during life, and on the death of any child without issue, its portion is to be equally divided among the testator's surviving children, and the issue of such as may have died.

It seems to me that it was the intention of the testator to make a final disposition on the death of a child without issue; for he directs in the first instance that the allotment shall be for

Vail v. Vail.

the benefit of his children and their issue, and in the event of a
child's dying without issue, it is the portion set apart for such
child, not the mere income of it, or its use for life, which is to be
equally divided among the surviving children, and the issue of
those who have died, and he accordingly gives and bequeaths
such portion, not its income or its use, to such survivors, and the
issue of those who are dead, and when he gives his children
power to appoint by last will and testament, the will is that the
" share" of the one thus appointing shall " go to and belong to"
such surviving child as may be appointed ; and in case a child
shall die, leaving issue, he gives the " portion" of the child so
dying, not its income merely, to such issue.    Thus evincing a
design that the issue of his children, when they take, shall take
an absolute ownership, and not a mere usufruct ; and by parity
of reasoning, that his children, when they take, on the death of
a child without issue, shall take as to that portion in absolute
ownership also.    This conclusion is drawn from what seems to
have been the general scope of the will.    The particular lan-
guage used is to the same effect.    It is to be " equally divided"
among them, and is to " go to and belong to" such as may be
appointed, and these are words which easily import an absolute
ownership.    How could the share of a child dying without issue,
be equally divided, if one portion of it was to go for life, and an
equal portion go in absolute ownership, to one who might ob-
tain a right to the other portion by survivorship ; or how could
it " belong" to one who had only a right to enjoy it for life ?
The use of it might indeed belong to such tenant for life, but
the share or portion itself, which is expressly mentioned, would
in fact belong to some one else, to some remainderman, after the
particular estate should cease.    In this view of the case, there
is no suspension beyond two lives in being, of the power of alien-
ation or of the absolute ownership in the residuum, whether
such residuum is regarded in reference to that which necessarily
must, or that which possibly may, ultimately flow into it.    It is
insisted, however, that such suspension springs from that clause
in the will which directs the executors from the income of the
estate, either real or personal, to appropriate such sums as may

be necessary for the respectable support and education of the minor children, until each shall marry or attain the age of 21. In *Vail* v. *Vail*, (4 *Paige*, 328,) the chancellor held that under this clause the executors took the legal estate in the land for a term of years, which would end when the youngest child should arrive at the age of 21 or marry, and that this arises by necessary implication, because, though there be no devise of the land, in terms, to the executors, yet there was, by implication, a devise of the rents and profits during the minority of the children, or while they remained unmarried; and his language would imply that in the same manner the executors would be seised of the absolute ownership of the personal estate, were it not for the statute against accumulations.

I agree with the chancellor, for reasons already stated, in holding that the executors are seised of the legal estate as trustees, for the purposes of the will, and during the continuance of the trust, the estate which they hold is inalienable by them. (1 *R. S.* 730, § 65.) But is the beneficial interest of the *cestui que trust* so? Not unless the trust is for the receipt of the rents and profits of lands. (1 *R. S.* 730, § 63.) Now in *Vail* v. *Vail*, (4 *Paige*, 328,) the chancellor clearly holds that the trust is for that purpose; not for the purpose of selling merely, for in regard to that it was merely a devise of a power in trust; but for the purpose of receiving the rents and profits of the lands, and holding the surplus, after paying expenses of support and education, as a resulting trust for the heirs, and of receiving the income of the personalty in trust for accumulation. The estate is therefore inalienable, either by the trustees or the *cestuis que trust*, at least until the youngest child shall attain the age of 21, when the provision for support and education is to cease.

It appears from the pleadings, that at the death of the testator, four of the children were minors, so that this trust would not terminate until the expiration of four minorities. In the *James' will case*, (16 *Wend.* 61,) it was held that the limitation of an estate by the minorities of the persons named, is equivalent to the creation of an estate dependant on the lives of such persons, and that doctrine has been carried out in the later cases

Vail *v.* Vail.

which arose upon the construction of the provisions of our revised statutes as to uses and trusts and future estates. Be that as it may, there can not be, under our revised statutes, any limitation or condition whatever, moderate term of years, average duration of lives, minorities, or any other contingency that may by possibility suspend the ownership beyond the termination of two lives in being. (16 *Wend.* 129.) If the limitation be too remote in its commencement, it is void, and can not be helped by any subsequent event, or by any modification or restriction in the execution of it. It is the possibility at its creation that the event upon which it depends may exceed in point of time the authorized period, which is fatal. (4 *Kent's Com.* 283. 4 *Cruise,* 449. 2 *Burr.* 873.) Now, in this case, the trust may continue until the youngest of the minors shall attain the age of 21, notwithstanding that the other minors may all have died before that period ; thus enabling it to endure for a certain period after three lives in being have expired.

It is, however, contended that the trust is a separate one for each minor, and terminates as to each, as each attains the age of 21, or marries, and that as to each share, the limitation is consequently for only one life in being, or only one minority. This argument, however, overlooks two important and controlling considerations. One is, that there is no division or separation of any of the testator's estate, among or in respect to the children, until each shall attain the ages of 21 and 25, and no final partition until the youngest shall attain the age of 25, and that the income out of which the minors are to be supported and educated, is the income of the whole estate, real and personal. It is, however, further contended, that such a trust being illegal, can not be raised by implication : that there being no express devise to the executors of the estate, either real or personal, or of its income, rents and profits, they can become seised of the legal estate or absolute ownership only by implication, which will not be done, when the effect merely is to destroy the very estate which is thus raised up. It is true that the courts will not imply or presume that a testator intended what was unlawful ; (3 *Burr.* 1634 ; *Best on Pres.* 67, § 56 ;

Vail *v.* Vail.

2 *Smith's Lead. Cas.* 295;) but this rule is not applicable to the case in hand, for here the implication is that the testator devised the rents and profits to the executors. This was not unlawful, but on the other hand is expressly authorized by statute, (1 *R. S.* 728, § 55,) and this is the extent of the implication in the case. The statute then steps in and declares what the estate is, which is thus by implication created, namely, that it is a legal estate in him who is entitled to the actual possession, and the receipt of the rents and profits. (1 *R. S.* 727, § 47.)

It is, however, insisted for the infant defendants that the appropriation for support and education is, at the option of the executors, out of either real or personal estate, and that it might be taken from the latter; in which case no trust would be necessary in either the real or personal estate. The difficulty here, however, is that the court of chancery in 4 *Paige*, 328, has already decided under this will that it was the intention of the testator to accumulate the income of his personal estate. For such accumulation a trust was necessary. (*Kane* v. *Gott*, 24 *Wend.* 663.) So that as to the real estate a trust was necessary to enable the executors to receive and expend the rents and profits, and as to the personal estate, it was necessary to effectuate the intention to accumulate. Such is the effect of the decision of that court on the will in question, and I do not feel myself at liberty to disturb it. Affirming it, as I feel bound to do, the parties may be left to their remedy by appealing from my decision, and thus secure a review of the principle of that of the court of chancery.

There is, however, another view of the case, which appears to me to be quite important and controlling in its influence. It is quite apparent that it was the intention of the testator to have all his estate converted into personal property before its final distribution among his children; for except the provision as to the last payments of $25,000 to his daughters, in respect to which there may be an investment in real estate, if either of the daughters shall require it, every portion of his estate going to them, either in the first instance, or on the ultimate distribution, is to go to and be received by them as personal property. The

doctrine of equitable conversion will then be applicable to the whole of this will now under consideration, and I am bound to regard the whole of the property in question as personal. ' (2 *Pow. on Dev.* 60. *Leigh & Dal. on Eq. Con.* 1. *Kane* v. *Gott,* 24 *Wend.* 660.) The testator had an absolute right to throw it into this shape if he chose, and thus withdraw it from the operation of our statute of trusts. The revised statutes, as to trusts, (1 *R. S.* 627, *Art.* 2,) have nothing to do with personal property, either directly or by inference. The whole article is confined to lands, or their rents and profits. In regard to personal property, the absolute ownership is not inalienable unless there is a contingent remainder, and the contingency has not yet occurred, and the only restriction of the statute in regard to trusts of personal property is to be found in the sections which forbid the accumulation of the income or profits arising from personal property beyond the cases specified in the statute. (1 *R. S.* 773, §§ 3, 4, 5.)

Now it seems to me, that regarding this estate as personal, there are two difficulties in the way. 1. It is all inalienable, by reason of the contingent remainders. The first takers in all instances take for life only, and the remainders go over either to the issue of the tenant for life, or to the other tenants for life, contingent on the first takers dying with or without issue. To support these remainders a trust is necessarily created in the executors. 2. It has already been held by the court of chancery, in *Vail* v. *Vail,* (4 *Paige,* 328,) that it was the intention of the will that this trust was also created for the purpose of accumulating the income until the time appointed for the ultimate division among the testator's children, and that such devise for accumulation was void as contravening the statute.

Whatever may be the conclusion as to whether any portion of the estate is inalienable for more than two lives in being at the death of the testator, it has been already decided that one great purpose of the trust, namely, that of accumulation, has failed; and the inquiry remains, whether the trust will be sustained to support the contingent remainders, when its chief and primary purpose has failed. In the earlier cases of *Hawley* v.

Vail *v.* Vail.

*James*, and *Coster* v. *Lorillard*, the court went a good ways in overthrowing valid portions of a will when engrafted into a trust which was in some respects void. But in later cases, a different disposition has been shown, and I regard it now as well settled, especially in regard to trusts of personal property, that where personal estate is vested in trustees upon various trusts, some of which are valid, and others void, the courts must sustain those which are legal and valid, if they can be separated from those which are illegal and void. (*Van Vechten* v. *Van Veghten*, 8 *Paige*, 128.) But the difficulty in this case is to sustain the trust to support the contingent remainders, without carrying along with it the trust for accumulation. It must be borne in mind that the trust in this case has its creation not in any devise of the estate by the will to the executors, but in the implication rendered necessary to sustain the ultimate purposes of the testator. Thus, as an accumulation could not be effected without a trust, a trust was necessarily to be implied, and it would be difficult now to sustain the trust, without carrying along with it the purposes out of which it had its origin. Those purposes have already been declared to be illegal and void, and the trust which had its origin in them, must necessarily fall with them. And the intention of the testator as interpreted by the court of chancery, clearly mingles the illegal accumulations with the residuum in regard to which the contingent remainders are framed ; and if the provision for accumulation could have been effected, it would have been as difficult to separate from the residuum such accumulations, as it would any portion of the principal fund. The two are intimately mingled together in the intention and ultimate disposition, as interpreted by the court, in a decision from which I repeat I do not feel myself at liberty to depart. It seems to me, therefore, that the whole trust, with its purposes, as well of supporting contingent remainders as of accumulating the income, must necessarily fall together, because they can not be separated, and one can not be sustained without carrying the other along with it.

I have already had occasion to remark, that on the principles

of equitable conversion, the whole estate of the testator is to be regarded as personal property. Although the statute in regard to uses and trusts does not apply to personal property, the statute in regard to future estates in lands does. (1 *R. S.* 773, § 2.) There is more than one trust in this will. One arising by necessary implication, and so held in 4 *Paige*, out of the direction to apply the rents and profits of either real or personal to the support and education of the minor children, and the other expressly created, commencing on the final division of the property among the children. The first trust necessarily expired on the youngest child's attaining the age of 21. And the second would not begin until such child should attain the age of 25, nor then unless the widow should be dead. The second trust, then, is a future estate limited to commence in possession at a future day without the intervention of a precedent estate. (1 *R. S.* 723, § 10.) And it is contingent because the person to whom it is limited—whether one or more of the children of the testator, or the issue of some such child who may have died—is uncertain. (*Id.* § 13.) Such a contingent future estate is inalienable, because there are no persons in being by whom an absolute fee in possession can be conveyed, and is void in its creation if the power of alienation is suspended for a longer period than two lives in being at the death of the testator. (*Id.* §§ 14, 15. 1 *R. S.* 773, § 1.)

In regard to some of the bequests, it seems to me that the power of alienation is, or rather may be suspended for an illegal period. Thus, in the five bequests of $50,000 each, to the daughters, each takes for life only. If either of them should die before attaining the ages of twenty-one or twenty-five, leaving issue, such issue might take for life only; for the provision of the will is, that in case either of the children die, leaving no lawful issue *living at the time the payments are to be made*, the amount is to form part of the residuum, and when it gets into the residuum, it may still be held for life only, for the first taker of the residuum takes for life only, and none of the daughters take of the residuum otherwise than for life, except where they take as contingent remaindermen. The whole of these sums

Vail *v.* Vail.

then, have been so devised that the power of alienation may be suspended for at least three lives in being, the last life being provided for in the future estate created by the devise of the residuum. Such future estate must, therefore, be regarded as void in its creation. (1 *R. S.* 723, § 14.) No option is left; for though by section 17 it is declared that where a remainder is limited, on more than two successive estates for life, all the life estates subsequent to the two first shall be void, and the remainder take effect as if no other than the two life estates had been created, yet section 14 declares that the future estate itself shall be void in its creation, and not merely the limitations over. Both these sections must be allowed to operate, and that can only be done by holding that section 17 applies only to present, and not to future estates. The effect of this is not confined merely to that part of the property whose alienation may be illegally suspended—but it is broader, it destroys the future estate itself, and destroys it *in toto*, because it declares it void in its very creation. This principle is not new in our jurisprudence. It is the application of the maxim, that the statute destroys whatever it touches, while the common law, as a nursing father, saves what it can—*valeat quantum valere potest*—and is of frequent occurrence : for instance, in relation to fraudulent conveyances, where not merely is the illegal provision overthrown, but the instrument itself, the conveyance or future estate, or whatever it may be that may be resorted to as the means of effecting an unlawful purpose.

A question yet remains to be considered ; and that is how far the decree in the suit of *Vail* v. *Vail* is a bar to the relief sought in this suit. The point is not raised by the pleadings, but being presented in behalf of the infant defendants who by their guardians *ad litem* have put in a general answer, it can not be overlooked. I have not before me the bill of complaint filed in that suit, and have not therefore any means of ascertaining with certainty the character of the relief therein sought. The report of the case in 4 *Paige* states that the bill was filed to obtain the decision of the court as to the construction of certain parts of the will, and that by it, it was claimed that each of the chil-

dren was entitled to 1-6th of the rents and profits of the real estate and 1-6th of the income of the residue of the personal estate after satisfying certain legacies; and the chancellor in his decision declares, that the principal if not the only question before him was as to the disposition of such rents, profits and income. He thereupon proceeded to dispose of that question, and in his opinion, as well as in the final decree in that suit, he alluded to and disposed of that question and none other. This is all the means I have of ascertaining the purposes and objects of that suit. There is no doubt of the soundness of the principle contended for, viz. that the judgment or decree of a court possessing competent jurisdiction shall be final, not only as to the subject matter thereby determined, but as to every other matter which the parties might litigate in the cause and which they might have had decided. (*Le Guen* v. *Gouverneur*, 1 *John. Cas.* 492.) But a former decree, to be a good bar, must have been between the same parties and for the same subject matter. (2 *Story's Eq. Jur.* § 1523.)

In this case I have no means, as I have already remarked, of determining that the subject matter of the former suit and of this are the same, but on the other hand, so far as I can gather from the papers before me, the subject matter of the former suit, it related only to the rents, profits and income of the estate until the final distribution of the estate itself; whereas the suit now under consideration relates wholly to such final distribution, and in no respect affects such intermediate income; and the parties are clearly not the same, for none of the remaindermen, (although some were then *in esse*,) were parties to that suit, while they are all parties to this, and it was not competent for the court in that suit to pronounce upon the rights of such remaindermen, while here it is competent to do so. To allow that suit to be a bar to this would be to give here to the decree in it an authority and binding influence over those who were not parties to it, and were not bound by it, in any other form. It was insisted on the argument, that the contingent remaindermen would be bound by a decree in the suit where the owners of the particular estate were parties, and therefore they were not ne-

---

Vail *v.* Vail.

---

cessary parties. This would be true of the unborn remainder-men, from the necessity of the case, and in such case a decree might bind the persons not in being. (*Story's Eq. Pl.* § 145. *Gifford* v. *Hart*, 1 *Sch. & Lefroy*, 408.) But it is not true of remaindermen then *in esse*; and there were such at the time of the former suit who were not made parties. Beyond this, the doctrine of virtual representation to the exclusion of a re-mainderman from being a party does not extend, except in the single case of the first tenant in tail *in esse*, in whom is vested an estate of inheritance, and who may therefore represent those who may claim in remainder or reversion after such vested es-tate of inheritance. (*Calv. on Parties*, 48, 52.) The doctrine can not, however, help out the bar which is set up in this case, because there were remaindermen *in esse* who were not made parties to the former suit, and could not be bound by a decree in it.

The result of this examination being that the ultimate dispo-sition in the will is void, and that as to the residuum of his es-tate, the testator died intestate, a question remains as to the rights of his wife and her second husband, M. Morin.

The second marriage was made in France, where M. Morin was domiciled, and where Madame Morin died, so that his rights in the matter are to be determined by the laws of France. My imperfect knowledge of those laws, and the hazard that I necessarily incur of falling into some error in regard to them, cause me to approach the decision of this point with much diffi-dence, and to regret that those laws, so far as they affect this question, had not been fully proved before me. As I under-stand the French law, marriage does not alter the rights of the parties to any property they respectively owned before marriage; the property of each continues his or her own separate property, independent of any control by the other. The rights of the par-ties may be, and in this case were, defined and regulated by contract between them before marriage. There are two prin-ciples, either of which may be adopted in such a contract. 1. *Communanté*, or community of goods. 2. *Régime dotal*, or dotal system. The parties may declare in general terms that

they intend to marry either under the principle of community of goods, or under the dotal system. (*Code Napoleon, Art.* 1391.) The principle of community merges all the personal property of the wife, present and future, and all the income of her real estate, into an eventual community *of goods,* of which the husband has the entire disposal, without liability to account to any one for the same.

The community embraces 1. All the personal property which the parties owned on the day of the celebration of the marriage, together with all the personal property that may come to them during marriage, by descent, or even by donation, if the donor has not expressed himself to the contrary. 2. All income, interest, and arrears accruing during marriage. 3. All real property acquired during marriage. (*Code Nap.* 1400.) Real property owned by the parties before marriage, or coming to them during its continuance, by descent, does not enter into the community. (*Code Nap.* 1404.)

The dotal system has a different effect, and aims at keeping separate the respective rights of the parties to such property as they owned before marriage, and especially to secure to the wife the exclusive control and enjoyment of her estate, principal and income, unless surrendered to the husband by express stipulation. The parties having agreed to contract marriage under the dotal system, must declare such intention in a specific clause of the contract. A mere declaration that the wife settles upon herself certain property, or that the parties marry without community, is not enough. (*Code Nap.* 1391, 1392.) Besides making the specific declaration, she must constitute her dowry; that is, enumerate the parcels of property of which it is to be composed. (*Code Nap.* 1541.) The dowry is the property which the wife brings to her husband in support of the expenses of the marriage. (*Code Nap.* 1540.) The settlement of the dowry—*constitution de la dot*—may embrace all the present and future property of the wife, or all her present property only, or part of her present and future property, or even an individual article. The settlement, in general terms, of all the wife's property, does not comprehend future property. (*Code Nap.* 1542.)

Vail v. Vail.

The husband alone has the management of the property in dowry during the marriage; (*Id.* 1549;) and he or his heirs can be compelled to restore the dowry after the dissolution of the marriage. (*Id.* 1549, 1564.) Hence it would seem that the wife retains in herself the ownership of the principal that is put into dowry, the income only going to the husband during coverture; and also retains to herself the ownership of all property not put into the dowry, and that on her death it goes to her heirs, to whom the husband is bound to restore the principal. All the property of the wife, which has not been constituted dowry, is paraphernal. The husband can not meddle with such property. (*Code Nap.* 1574.) The wife retains the control and enjoyment of her paraphernal property, but she can not alienate it, nor appear in judgment in respect of such property, without the permission of her husband, or if this be refused, without the authorization of the court. (*Code Nap.* 1576.

Hence it would seem that, without a specific contract, marriage does not, under the French law, abridge or alter the rights of the wife to any property she owned previous to the marriage, or which subsequently falls to her: that a marriage contracted under the principle of *community*, places the parties substantially on the same footing as at common law; that under the *dotal system*, the wife's property remains entirely her own, unless she has specifically in the marriage contract constituted it her dowry, or made it dotal; that where she has constituted no dowry, her property remains paraphernal, or entirely her own, the husband having no farther interest in it than to compel her, out of it, to contribute to household expenses: that to constitute property dotal, it must be specifically mentioned and described, and that what is so mentioned, the husband may enjoy the income of during marriage, but the principal still belongs to, and must be returned to the wife or her heirs, on the dissolution of the marriage, and that her property not constituted dotal, remains paraphernal—that is, her own separate, exclusive property, fee, principal and income, in possession at the time of the marriage, or coming to her afterwards, subject only to its liability to

contribute to household expenses, and restricted as before mentioned in the power of alienation.

Under this law, thus briefly stated, M. Morin and Madame Salles entered into an ante-nuptial contract, in which, by Art. I. they declared that they adopted as the basis of the civil conditions of their marriage, the dotal system, such as it is defined by the provisions of articles 1540, and the following of the civil code of the French, and by Art. IV. the wife sets forth the parcels of property which are to constitute her dowry ; viz. the income of one-third of the property belonging to the estate of her late husband, as therein set forth, referring to the decision in the case of *Vail v. Vail*, three mortgages specifically mentioned, valued at 83,500 francs, personal effects and wearing apparel valued at 7000 francs, and divers personal goods, silver plate, and her own jewelry, valued at 13,060 francs. By Art. VI. entitled " Constitution of the Dowry," it is declared that " all the present property of the intended wife, and all such as may come to her hereafter, by descent, donation, legacy or otherwise, is and shall remain dotal to the intended wife." Under these provisions of the marriage contract and the laws of France, I can entertain no doubt that on the death of Madame Morin, all her interest and estate in her first husband's property passed to her heirs, and that her second husband, M. Morin had no right in or title to it.

There are, however, other provisions of the marriage contract and of the French laws which bear on this question, and which may not be overlooked. Persons entering into the marriage contract under the dotal system may establish other property relations between them, without impairing the rights of property secured to each by that system, and that is by forming a copartnership of acquisitions. (*Société d'Acquêts ; Code Nap.* 1581.) The object of this association is to regulate and determine the rights of the parties to such property as may be acquired during the marriage from savings and accumulations, whether derived from the income of property made dotal or from earnings or proceeds of their joint industy, thus securing to the wife and her heirs a share in such savings or acquisitions,

whereby the wife, on the death of her husband, or the wife's heirs on her death, may take back not only the principal of that which has been made dotal, but so much of the income thereof as may have been saved during marriage. "In such case after each party has levied and taken back his or her dowry duly constituted, the division of the profits of the *Société*, comprises the acquisitions made by the parties jointly and severally during the marriage, whether arising from the proceeds of their joint industry, or from the savings out of the fruits and income of the property of either." (*Code Nap.* 1498.) The marriage contract between these parties, in its Article II. declared that "Nevertheless there shall be between the said intended husband and wife a *Société d'Acquêts*, the operation of which shall be regulated in conformity with articles 1498 and 1499 of the code, subject to the modifications mentioned in the contract;" and by Article IX. entitled "power of the wife to take back her own," it is declared that "the intended wife or her children shall, on renouncing the *Société d'Acquêts*, have the right to take back all the property belonging to the intended wife which has been designated above, or such as shall legally represent it, together with all the property, personal and real, which may have come to her during the marriage by descent, donation, legacy or otherwise." Article 1499 of the Code Nap. enacts that such personal property existing at the time of the marriage, or which may have come to the parties since, as shall not have been identified by inventory or statement in due form, shall be deemed to have been acquired and be considered as acquisition. Now whether the right of Mad. Morin to a distributive share of her first husband's estate, by reason of the failure of the ultimate devise of it, be regarded as dotal under article 6 of the marriage contract, or as acquisition under article 1499 of the code, she, on the death of Morin, and her children on her death, seem to have had the undoubted right reserved by articles 2d and 9th of the marriage contract to take it back as their own property, exempt from any claim of Morin to any thing else than its income during the existence of the marriage.

If any doubt, however, existed as to the rights of M. Morin

under the marriage contract, they seem to me to have been effectually removed by the compromise made between him and the heirs of Mad. Morin in France after her death, and confirmed in due form by the judgment of a competent tribunal. The 10th article of that compromise is as follows: By means of the execution of these presents, and whatever may have been the rights of Mad. Morin to the property existing on the day of the death of her first husband, and whatever may be M. Morin's rights to the property of the society of acquisitions, (*Sur les biens de la Société d'Acquéts*,) M. Morin shall, under no pretext whatever, prefer any claim against the heirs of his wife, which shall have for its object to augment the funds of said society, (*l'Actif de la société*,) nor shall said heirs prefer any claims against M. Morin.

Under this view of the case M. Morin can be regarded as entitled only to so much of the income of his wife's share of her first husband's estate, as had been earned and had not been paid to him at the time of her death, and to nothing more. That may be ascertained on a reference, unless otherwise agreed among the parties.

And as to the residue of this case, it is to be decreed that the specific bequests of $500 to the French Benevolent Society, of $250 to the Roman Catholic Orphan Asylum, the bequests to the testator's cousin, Crozes le fils, to his cousin born soubries, the wife of Laquide, to Francis Youett and his children, the bequests of $10,000 to Mrs. Tonnele, and of $75,000 to the son, be and stand effectual and valid, and that as to the residue of his property, the testator died intestate, and such residue must be distributed among his next of kin as personal property.

The provision of the will that the testator's children shall share equally in his estate, is untouched by any of the considerations which have been mentioned. His direction is that all of his estate which shall remain shall be allotted and set apart for the use and benefit of his six children and their issue, and in such proportions as to equalize with interest the previous advances which shall have been made by the executors, saving the $10,000 given to Mrs. Tonnele, and the $25,000 devised

for the use of his wife. In the final distribution, therefore, each of the daughters will be charged with the $50,000 received by each, and the son with the $75,000 received by him, with interest, and the residue of the estate be so divided as to make them equal with each other.

The costs of all the parties, with reasonable counsel fees, to be paid out of the residuum before distribution, and for the purposes of distribution there will be a reference to Thomas Addis Emmet, with a reservation of other questions until the coming in of the report.