### In re MORLEY'S WILL.

(Surrogate's Court, Monroe County. October 5, 1909.)

1. WILLS (§ 157*)—UNDUE INFLUENCE—CONFIDENTIAL RELATIONS.

Courts will look with scrutiny on the influence of persons occupying confidential relations with testator, especially when such persons are not related by blood to testator; and where a physician not related to testator secured a large benefaction under the will, and it appeared that he attempted to influence the testator, the question whether the influence was undue must be investigated.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 383, 384; Dec. Dig. § 157.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. WILLS (§ 166\*)—UNDUE INFLUENCE—EVIDENCE.

Evidence *held* to show that a will was procured through the undue influence of the principal beneficiary therein, justifying the court to refuse probate.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.\*]

3. WILLS (§ 405\*)—PROBATE—CONTEST—COSTS.

The costs of one successfully contesting the probate of a will on the ground of undue influence, and the costs of the executor, who was inno cent as to the undue influence, and the costs of a special guardian repre. senting an incompetent party, are chargeable against the estate.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 879–884; Dec. Dig. § 405.\*]

Application for the probate of the will of Flavia M. Morley, deceased, to which Harriet S. Heath and Eugene Blodgett filed objections on various grounds. Probate refused.

Proceedings for the probate of a will, contested on four grounds, charging unsoundness of mind at the time of the execution of the instrument in question, that it was not properly executed, and was not subscribed by the said decedent and published and attested as her last will and testament, and, further, that if said instrument was executed by decedent the execution thereof was procured by undue influence and fraud on .the part of Robert A. Van Allen, a physician, and also other persons to said contestant unknown; said Van Allen being a legatee mentioned in said will.

Werner & Harris, for proponent.

Warren & Shuster, for Robert A. Van Allen.

H. F. Remington, for contestant Heath.

James S. Havens, guardian ad litem, for contestant Blodgett.

BROWN, S. A large amount of testimony has been taken in this case, and some of it directly conflicting. It appears to the court from the evidence submitted herein that Flavia M. Morley, the decedent, for some years prior to 1901 resided in the city of Rochester with her husband, L. E. Morley. They were prominent in church work, and especially in temperance work. They were both well known as advocates of prohibition and were wholly opposed to the use of liquor in any way. They had accumulated considerable property, having cash deposits in their joint names in the Rochester banks in 1901 of about $16,000. Mr. Morley also owned real estate, on some of which, for some reason or other, Mrs. Morley held mortgages. They were careful people in money matters and did not indulge in speculation. Mr. Morley's business was looking after his property and doing a small real estate business. About a year before he died, upon a case of sudden illness, Dr. Van Allen, a neighbor, was called in, and during the short time that elapsed from that time until the death of Mr. Morley Dr. Van Allen suggested to Mr. Morley the advisability of buying stocks, at which time Mr. Morley disagreed with the Doctor as to such a venture. Mr. Morley died on the 27th day of May, 1901. Dr. Van Allen on that very day suggested to Mrs. Morley a lawyer to look

after her business by the name of Egerton R. Williams, Jr. At the same time he also offered to loan money to Mrs. Morley.

On the second night after Mr. Morley's death this same doctor, on the way home with Mr. William C. Strobel (who was at that time paying attentions to Estella Morley, who resided in the family of Mr. and Mrs. Morley in the capacity in fact, if not in law, of an adopted daughter), suggested to Strobel that they (Van Allen and Strobel) should work the Morley family together and make a good thing out of it. This is the beginning of Dr. Van Allen's intrusion into the Morley household. Mrs. Morley followed his advice, and engaged Egerton R. Williams, Jr., as her attorney. Williams procured the probate of Mr. Morley's will, took proceedings to fix the inheritance tax, and foreclosed two mortgages, being the mortgages held by Mrs. Morley against Mr. Morley's property, the life use of which had been devised to her by the will of Mr. Morley. It appears that between May, 1901, and February, 1902, Mrs. Morley paid Williams $2,810 at least.

In 1902 Williams drew a will for Mrs. Morley, in which she left Williams and Dr. Van Allen each a legacy of $1,000, besides making Williams her executor and trustee, leaving nearly all of her property in his hands as trustee, and fixing his commissions at 10 per cent. In the midst of these foreclosure suits we find that an answer was put in by a tenant, Mrs. Huxley, in which she claimed she had a lease of the premises for nearly a year, which answer was subsequently withdrawn by stipulation, and it appears that this Mrs. Huxley was sent by Williams to Dr. Van Allen for her money. She received $75 from Dr. Van Allen, and that was all that she ever received from anybody, as far as the evidence shows. Dr. Van Allen took an active interest in urging upon Mrs. Morley the settlement of the Huxley matter, and Williams was paid $500 by Mrs. Morley by a check on the Rochester Savings Bank. Mrs. Morley subsequently became suspicious, and called on Mrs. Huxley, and asked her how much she had received, and when Mrs. Huxley told Mrs. Morley she had received only $75 Mrs. Morley exclaimed, "Oh dear! Oh dear!" At the same time Mrs. Morley asked Mrs. Huxley: "Do you know that Dr. Van Allen is trying to make trouble?" In connection with this episode it is well to call to mind the effort made by Dr. Van Allen to magnify this affair, by stating to Mrs. Morley intimations of improper conduct on the part of Mr. Morley, and also of his insinuations relative to the parentage of Estella, insinuations shown herein to be absolutely devoid of truth.

In February, 1902, Mrs. Morley began to deal in stocks, on Dr. Van Allen's advice and at his instigation, and continued in such business until her losses in stocks were upwards of $2,000. Mrs. Morley's papers also show a mysterious account of moneys loaned, and in some of the entries such loans are marked in her writing as "loaned to a party." It is unnecessary for the court here to go into a discussion of all of those items. It shows that she was carrying on some kind of a transaction with somebody whose name she did not care to have appear upon her books, and some of the items of such payments correspond very closely with similar amounts placed to the credit of Dr. Van Allen, and it appears that these loans aggregated more than $5,700.

Some time between the latter part of 1902 and July, 1903, Mrs. Morley and Dr. Van Allen had some misunderstanding with Attorney Egerton R. Williams, Jr., and on July 20, 1903, Mrs. Morley made a new will, on which occasion she went to Attorney William H. Davis, who was then the attorney of Dr. Robert A. Van Allen, to draw the same. This will of July, 1903, gave to Dr. Van Allen the Prospect Street property and the Delavan Street property, then owned by Mrs. Morley. This gift by will could not have been made, had the mortgages not been foreclosed which were held by Mrs. Morley against certain real property of Mr. Morley. In March, 1905, Mrs. Morley again went to Mr. Davis and had her third will drawn, in which she left Dr. Van Allen all of the Morley Place property and the balance of her real estate, aside from the homestead, which she left to her sister, Mrs. Heath, and the Griffith Street property and $500 in money left to Estella Strobel. Mrs. Morley died in September, 1906, at which time substantially all her personal property had disappeared.

Now we must go back and consider the relations which Dr. Van Allen, who continued to be the family physician of Mrs. Morley up to the time of her death, sustained with Mrs. Morley and her household. It appears that he called there very frequently, and generally did so evenings. We find that he is drinking wine in her parlor, and is there at times in an intoxicated condition. We must bear in mind that this is being done in the house of a woman who previously had been an active advocate of prohibition. We find Mrs. Morley's habit of church-going lessening, until finally she rarely attends church, and her activities in mission work practically cease, and she gives up the teaching of a Bible class, which she had taught for some time previous to the advent of Van Allen's influence in the household. We find Van Allen attempting to poison her mind toward Estella Morley Strobel, who previous to that time was held in very high esteem by Mrs. Morley; in fact, we believe that Mrs. Morley continued to the time of her death to hold said adopted daughter in high esteem, but that she was affected in her treatment of her by reason of the insinuations of Dr. Van Allen against her—not that Mrs. Morley believed these insinuations against Estella, but the effect of the conflict of mind caused in Mrs. Morley by Dr. Van Allen's insinuations and conduct influenced her in her acts towards Estella, not only regarding the making of a will, but also in other matters during the lifetime of both.

We find Van Allen speaking of Estella as "that damn thing." We find that Mrs. Morley, in doing things for Estella and Estella's baby, was insistent that Estella should not tell who gave her these presents, for she did not want Dr. Van Allen to know that she was doing these things. We find Van Allen in the spring of 1903 insisting to Mrs. Morley that he ought to have more than she had given him in her previous will of 1902.

"He said that it was not using him right * * * to place him on a level or below the level of Estella, and he was entitled to more than he was getting under her previous will, and he also stated that he wanted and had a perfect right to demand the Prospect Street piece of property, and to which she says, 'Why, Doctor, I have left you all I can; I have promised everything else to Estella,' to which he replied that he would quit her if he did not get more,

that he refused to be put below the basis of Estella, that he would leave her, and then she would see what those 'damn things' would do for her."

He further said:

"Why in hell don't you deed everything over to her, and then she will kick you out of the house, and you can go to the poorhouse for the rest of your life."

It was after this sort of conversation that the second will was made in 1903, which gave Dr. Van Allen the Prospect Street property and the Delavan Street property, and yet this was not satisfactory to her attending physician, and in the latter part of the year 1903 we have this conversation in evidence between these people before us:

"He said that all that Strobel was coming around her for was for your money, and it made him damn sore to stand such things as are going on in the house. Mrs. Morley said: 'Why, Doctor, haven't I given you two of my best pieces of property? Haven't I made my will just as you wanted it made?' He said: 'Yes, you made your will just as I told you to make it; but it does make me damn sore to let such things go on as they are going on out there.'"

It further appears that Dr. Van Allen said to her that he was not satisfied with that will, after she had stated that she had made the will exactly as he had told her to make it, and she said, "If you won't leave me, Doctor, I will go to the expense of having a new will made." The new will was made in March, 1905, and subsequent to that Mr. Strobel was at her house and she told him "that she was not her own boss; that she would like to do a great deal more for Estella than she was doing; that she could not do as she wanted to, she could not tell why." Upon Mr. Strobel's asking her on one occasion why she did not get rid of Van Allen, after she had warned Strobel not to cross the path of Van Allen, that he was a terrible man, and Strobel asked her why she let him come around, she answered:

"Well, I can't tell you why; but I can't get along without him. Things are such that I cannot explain."

We also find in the record testimony tending to show that at one time Dr. Van Allen boasted of his influence over Mrs. Morley, and stated that he could do anything he wanted with Mrs. Morley; "that he could tell her that black was white, and she would say, 'Yes, Doctor, black is white.'" If the evidence of Strobel is to be believed in this case, the above is but a small epitome of what it shows. The court watched the witness Strobel with a great deal of care, his story was so amazing, the setting so romantic, the facts rehearsed so startling, taking the condition, the character, and former make-up of Mrs. Morley into consideration; but after careful observation of the witness on the witness stand, his demeanor, his manner of expressing himself, his coolness on cross-examination, his absolute frankness, this court is led to believe that he told the truth, and looks upon this case as one of those cases where we find that there are facts which exist in some cases which are as strange as the stories of fiction, and from the facts shown by the testimony of Mr. Strobel, some of which are signally corroborated by the testimony of other witnesses, taken with the further fact that Dr. Van Allen occupied a confidential relation with Mrs.

Morley as her attending physician, the court is of the opinion that the will offered for probate herein was not the free and unrestrained act of Mrs. Morley, but was procured through a long series of undue and fraudulent practices, practiced upon Mrs. Morley by the said Dr. Van Allen, which coerced her will and led her to do that which was not her free act and deed. It is becoming that the court should say, however, that in the drawing of the will offered for probate herein by William H. Davis, an attorney of this court, there is no inference of any improper conduct on his part; in fact, there is none relative to his conduct as to either of the wills drawn by him. He simply did what he was asked to do, declining to accept a legacy which was offered him by Mrs. Morley at the time of the making of the will of July, 1903.

The courts look with scrutiny on the influence of persons occupying confidential relations with a decedent, and particularly so when such persons are. in no wise related by blood with the testator. A lawyer, minister, or physician, not so related, securing a large benefaction under a will, who is shown to have attempted to influence the testator, is subject to the most searching investigation as to whether or not such influence is not an undue and improper influence. When that influence is exerted by hard, unmannerly conduct in the presence of the decedent, when reports to the detriment of a person near and dear to decedent are rehearsed to decedent, some of them absolutely false, naturally an undue influence must be predicated. When a testator under such conditions makes a will of the character of the will in question, making such physician the chief beneficiary, comparatively, of her property, to the detriment of one who was naturally the object of her bounty, and who, until such influence was used, was declared by her as the person to become her chief beneficiary, the judicial mind of the court is not satisfied that said will was the free act and deed of the decedent.

"Undue influence and fraud, which the law guards against, may be exercised in an almost infinite variety of ways. A prejudice and aversion to a child may be created in the mind of a testator by misrepresentation of the conduct and feelings of this child toward another, which, in connection with other facts, such as were shown in this case, may be sufficient to affect the validity of a will in which the child in regard to whom the misrepresentations were made is ignored in the distribution of the father's estate by will." In Matter of Budlong, 126 N. Y. 423, 27 N. E. 945.

In Marx v. McGlynn et al., 88 N. Y. 357, the court, at page 370, says:

"There is another kind of influence, more common than that just referred to [physical coercion or threats], and that is where the mind and the will of the testator has been overpowered and subjected to the will of another, so that, while testator willingly and intelligently executed a will, yet it was really the will of another, induced by the overpowering influence exercised upon a weak or impaired mind. Such a will may be procured by working upon the fears or the hopes of a weakminded person, by artful and cunning contrivances, by constant pressure, persuasion, and effort, so that the mind of the testator is not left free to act intelligently and understandingly. It is not sufficient, however, for the purpose of establishing undue influence, to show that the will is the result of affection or gratitude, or the persuasion which a friend or relative may legitimately use; but the influence must be such as to overpower and subject the will of the testator, thus producing a disposition of prop-

erty which the testator would not have made, if left freely to act his own pleasure, and this kind of influence will not generally be presumed, but must be proved, like any other fact, by him who alleges it. But there are certain cases in which the law indulges in the presumption that undue influence has been used, and those cases are where a patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close confidential relationships exist. Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and some proof should be required besides the factum of the will before the will can be sustained."

In recapitulation we find:

First. That Flavia M. Morley, a resident of the city of Rochester, county of Monroe, and state of New York, was of sound mind and memory on the date of the making of the will offered for probate herein. That she executed the same in the presence of two witnesses, and acknowledged the execution of the same, and declared the same to be her last will and testament, and requested the two witnesses to sign their names as witnesses thereto, which they accordingly did, in her presence and in the presence of each other.

Second. That the will offered for probate herein was not her free and unrestrained act and deed, but was procured through the undue and improper influence and fraudulent acts of Robert A. Van Allen upon her exercised over a series of years.

I find, as conclusions of law, that the will offered for probate herein should be denied probate, and the petition of the petitioners be dismissed, and the objections of the contestant as to undue influence and fraud of Dr. Van Allen in procuring the execution and publication of said will be sustained, with costs to the contestant as of a contest, to be paid out of the estate, and, as the executor of said will appears to have been an innocent party in connection with the undue influence exercised over the testator, costs are allowed to the executor as of a contest, to be paid out of the estate, together with allowance to the special guardian as of a contest for representing the incompetent party herein, to be paid out of the estate. All to be taxed and fixed upon the settlement of the findings and decree herein. The fees of the stenographer for furnishing minutes, amounting to $148.73, are to be paid as a disbursement, payable out of the estate.

Let formal findings be drawn in accordance with this decision, to be settled with the settlement of the decree and of costs, and allowances, upon three days' notice.