## In the Matter of the Estate of LAURA GUIDI, Deceased.*

Surrogate's Court, New York County, January 23, 1940.

*Joseph A. Modr*, for the proponent.

*Whitman, Ransom, Coulson & Goetz*, for the contestants.

DELEHANTY, S. An attorney at law — a stranger in blood to deceased — propounds as her last will an instrument under which (after a specific gift of some jewelry to his wife) he takes the whole net estate. All objections to the instrument were dismissed except those which challenge it on grounds of fraud and the undue influence of proponent.

Deceased was a woman of about fifty-four who was prematurely aged in her physical appearance. An autopsy disclosed internal physical deteriorations which produced the external evidences of

---

* Revd., 259 App. Div. 652.

age. Deceased for a long time had been so deaf that communication to her was required to be in writing. This condition as well as her other physical ills made her life a lonely one — almost that of a recluse. In the later stages of her existence she had no friends who called on her. She had contact with the world outside her apartment almost wholly through her reading and through the proponent.

The proponent was originally employed by deceased to collect for her an interest in the estate of her stepfather. He was introduced to deceased by the undertaker who buried deceased's stepfather and her own mother. He knew deceased only two years and a month. During this period proponent had some nominal contact with one law office in Manhattan and with another in Queens county but apparently kept such files as he had in the home of his mother whose apartment was a block away from the undertaker's shop. Proponent pays no office rent, has no employees and has no regular office hours. His contacts with his clients are made chiefly by his calls on them, not theirs on him. On deceased, respondent called weekly or more frequently. He had a key to her apartment and admitted himself when he arrived. Deceased's deafness was so complete that she could hear neither telephone nor door bell.

It appears implicit in the testimony that the proponent was fully paid for his legal work in the estate of deceased's stepfather and for some additional legal work in clearing the record to permit transfer of an asset originally owned by deceased's mother. In addition it is shown that in the twenty-five months of his acquaintance with deceased the proponent received from her gifts of small checks aggregating about $150 to $250, a gift of $2,000 or more in cash and also, he says, an interest as joint tenant in an account which at deceased's death carried a balance of nearly $7,000. The proponent claims this balance as survivor. In the balance so claimed is some $3,000 withdrawn from another savings bank, where it was in deceased's sole name, after the joint account was opened.

Proponent's testimony draws a distinction between his possession of the pass book evidencing this joint account and his possession of the other pass books of deceased. As to the joint account he asserts a possession of the pass book " for some time " prior to his latest possession of the others. Admittedly he had all the pass books at the year end prior to deceased's death and had the interest credited in each. It seems that he is asserting a transfer of the joint book to him under circumstances which amounted to a vesting of full title in him at that transfer date. If this be his position he is claiming *inter vivos* transfers to himself, without consideration, of over $9,000 of deceased's assets while he had a fiduciary relationship to her.

His complete dominance over deceased's affairs is shown not alone by the so-called gifts but also by the fact that the securities which constituted deceased's chief assets were disposed of by proponent largely through a brokerage office selected by him which reported the transactions to deceased only through proponent. In one instance of a security sale the facts are striking. The sale resulted in a check dated January 18, 1938, for $2,248.33 to deceased's order but sent in care of proponent. The check shows under deceased's indorsement a number which is that of deceased's account in Greenwich Savings Bank. The bank indorsements show that the check passed through the savings bank. On January 22, 1938, there was drawn in cash by deceased out of her account in the same savings bank the exact equivalent of the deposited check — $2,248.33. The savings bank was used obviously as a medium for cashing the check for the bond proceeds. It is this cash which proponent first swore he had received as a Christmas gift in 1937. His original version was that deceased spontaneously produced the money from her person and handed it to him; he wholly unaware of what its source was. This version was found untenable and proponent then " corrected " his testimony and said that the money came from the savings bank and that he was present when deceased got it there. Thus it is clear that proponent in fact controlled this transaction from the delivery of the bonds to the broker for sale down to the absorption by him of the proceeds of the sale.

This story of a 1937 " Christmas gift " made near the end of January, 1938, is matched by the claim of a 1938 " Christmas gift " of the joint account. The record shows that the joint character of the account was established in March, 1938, and patently was not then at least intended as a gift to be effective nine months later. Proponent accompanied deceased when his name was added to the account now claimed by him as survivor. He was present, too, in December, 1938, when deceased closed her account in Harlem Savings Bank and transferred these funds largely if not wholly to the joint account of which proponent now claims ownership.

From this survey of proponent's acquisitions from deceased in her lifetime the court passes to the consideration of the testamentary purposes of deceased. In 1937 deceased intended to give her estate to her cousin, Percy Mountain. With him and his family deceased was always on cordial terms, as the record shows. She and they had few personal contacts in recent years because the kin lived in Massachusetts but the correspondence between them shows that distance had not diminished the warmth of deceased's feeling for her cousin and his kin. She had helped him and had done so willingly as the record shows. Her last statement about him

reported by a credible witness was an expression of her pleasure at anticipating a visit from him. The 1937 will was drawn by proponent who was named executor therein. This will provided a a large sum for burial expenses. The balance was given to her cousin.

The proponent did not actually type the propounded paper drawn in 1938. Neither was he present in person when it was executed. Except for these reticences the will is proponent's handiwork. He arranged for deceased to go to the office where it was prepared. He advised the attorney who typed the will that it was to benefit the proponent. He gave to deceased the address to which she was to go. He arrived at that address himself shortly after the will was executed and checked the fact that deceased had made the will. The record admits of no other conclusion than that the will is proponent's in conception and effect. Considering that the choice of the actual draftsman was made by proponent, the latter's absence from the scene emphasizes rather than clears him from the responsibility which attaches to him as the real draftsman.

Since the court finds as a fact that proponent was the real draftsman of the will there flow consequences which control the issue in this proceeding. The applicable rules are stated thus in *Matter of Putnam* (257 N. Y. 140, 143): " The law, recognizing the delicacy of the situation, requires the lawyer who drafts himself a bequest to explain the circumstances and to show in the first instance that the gift was freely and willingly made. (*Matter of Smith*, 95 N. Y. 516.) 'Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and some proof should be required beside the factum of the will before the will can be sustained.' (*Marx* v. *McGlynn*, 88 N. Y. 357, 371.) In the absence of any explanation a jury may be justified in drawing the inference of undue influence, although the burden of proving it never shifts from the contestant. (*Matter of Kindberg*, 207 N. Y. 220, p. 228.) "

The court does not find in this record any valid explanation of the complete alteration between 1937 and 1938 of deceased's testamentary intentions. Nor does it find any valid reason why she should have intended to give all her remaining property to proponent. The propounded paper contains recitals respecting deceased's kin which are contrary to fact and which she could not have made unless she was under the constraint of proponent or unaware of what she was signing. The propounded paper is the final objective of proponent's planned campaign to possess himself of deceased's property. When it was signed deceased was under the complete domination of proponent. His control of her and of her affairs

continued down to her death. He put in charge of her during her last illness a person selected by him and through this person (discredited by the court) sought to show statements of deceased which would account for the propounded instrument. The court finds that the instrument was procured by the undue influence of the proponent operating on the mind of deceased and controlling it at the time of signature. Being such a paper, procured by such means, it must be denied probate.

Submit, on notice, decree accordingly.