(27 Misc. Rep. 618.)

### In re KEEFE'S WILL.

(Surrogate's Court, Rensselaer County. May, 1899.)

WILLS—UNDUE INFLUENCE.

    Where an aged person makes a will during his last illness, two days before his death, in favor of his physician's wife, who was a stranger of blood, to the exclusion of the natural objects of the testator's bounty, and in hostility to a prior will in their favor, and the evidence shows the transaction was attended with secrecy and opportunity for undue influence, the burden of showing its absence rests upon those who are benefited by the will.

Petition by Anna Miller for the revocation of the probate of the will of John Keefe, deceased. Decree of probate revoked so far as personal property is concerned.

    Albert C. Tennant and Charles Irving Oliver, for petitioner.

    Robert W. Hardie, for executor and others.

COMSTOCK, S. This proceeding is brought on the petition of Anna Miller, a sister and one of the next of kin of John Keefe, late of the town of East Greenbush, in this county, deceased, for a revocation of the decree of this court, made June 21, 1898, admitting his will to probate. This will relates to both real and personal property, and was proven and recorded as such; but this proceeding being under article 2 of title 3 and chapter 18 of the Code of Civil Procedure, any decree made herein applies to the personal only. Code, § 2647. The petition sets forth the usual grounds in such cases, viz.: First, that said alleged will was not the will of John Keefe; second, that it was not subscribed or published and declared by him to be his last will and testament; third, that he was not of sound mind, and "that the execution thereof by the said John Keefe was procured by fraud, artifices, circumvention, and undue and improper influences practiced against and exerted upon" him. So far as the formalities required by statute are concerned, in the execution of this paper, I am satisfied that they were all observed and complied with; hence I will consider the case under the last ground, viz.: Whether this paper so executed by him was really the expression of his own mind and intention, free, voluntary, and original, or did it express merely an intention which had been created by others by what the law recognizes as undue and improper influences. In the latter case, although he had testamentary intelligence, and the paper executed by him expressed his then wish and intention as to the disposal of his property, it would be void. Marx v. McGlynn, 88 N. Y. 370; Tyler v. Gardiner, 35 N. Y. 592. Testator left a farm situated in said town of East Greenbush, comprising 178 acres, which was unincumbered, and personal property amounting to $3,475.64, according to the official inventory on file. He was a bachelor, and at the time of his death, which occurred on the 7th day of June last, was 80 years of age. He left, him surviving, as his only heirs and next of kin, this petitioner, who is the wife of Stephen Miller, aged 78 years, Margaret Keefe, an unmarried sister, 82 years of age, a niece, Margaret Vosburgh, and a nephew, John K. Vosburgh, children of a half-brother. He had al-

ways resided on the Keefe homestead farm, which is the same mentioned above. His maiden sister, Margaret, had always lived with him thereon, and she and an old colored servant, Jane Briss, comprised his family and household at the time of his death. By the will in question, which was executed in the afternoon of June 5th, two days before his death, testator devises his said farm to the wife of his attending physician. He also bequeaths to her "all of the cows, horses, wagons, harnesses, farming implements, machinery, and utensils upon said farm. He gives to his executor the sum of $1,000 in trust, the income of which is to be used for the support and maintenance of said Jane Briss during her life, and, in case the income shall be insufficient therefor, directs the use and application of any part of the principal for that purpose, and, in case any part of said sum shall remain after her death, he gives the same to the two children of his said physician. He gives $200 to his said sister Margaret, and all the rest and remainder of his estate and property he gives and bequeaths to his said physician and his wife, share and share alike. In other words, with the exception of the $200 given to his sister Margaret, and so much of the $1,000 set apart for the support of the servant as may be used, his whole estate is given to the family of his said physician. As has been stated, testator was 80 years of age. Three or four days before he made this will he was prostrated with a heart difficulty which grew steadily worse until his death. Dr. Woodward, one of executor's witnesses, speaking of testator's condition on Sunday afternoon, the day the will was executed, says: "He was very weak, and suffering evidently a great deal of pain, labored breathing difficulty;" again "he had some other complications with his stomach and bowels"; again, "in point of fact, he was a very sick man. I can't say exactly pain,—it was distress. It evidenced itself in difficulty of speaking and breathing. He would seem to have to stop between words and catch his breath, as though he had to rest himself between. That was constant all the time I saw him." Witness was then asked, "So that, doctor, you saw while you was there that he was getting down, failing as time elapsed? A. I did." The attending physician also told the attorney who drew the will, while on their way to testator's house that Sunday, that testator was much worse. He also told Dr. Hailes, shortly after the testator's death, that he grew rapidly worse, and the lungs became complicated. Dr. Hailes, another of executor's witnesses, who saw testator on June 3d, says that he had valvular disease of the heart, and that he then advised him, if he had any business, to attend to it. "He said that he would like to make a will. I told him he had better make it." It would also seem from the testimony of this witness that the testator had lung complication. There can be but little, if any, doubt from proponent's own showing that when testator executed this paper he was on the verge of final dissolution. His life was rapidly passing away. His body and mind were in a weak condition, such as would render him an easy subject to, and defenseless against, the influences of those who were around him and ministering to him. So far as appears to the contrary, the relations between him and his sister Margaret, whose lives had been spent to-

gether under the same roof, were of the pleasantest character. No suggestion has been made to the contrary; and the court is bound to assume that the testator felt for her the interest and affection which should exist between brother and sister. He knew her great age and dependency, and he knew she possessed no property nor means of support, and why he left her unprovided for except by the paltry sum of $200, and gave his entire estate to those who were not related to or connected with him, either by blood or affinity, calls urgently for explanation. This the learned counsel for the executor has undertaken to do, and he has established the fact that for many years there existed between the latter and testator a warm personal friendship. The testator apparently entertained for him an attachment such as is often shown by childless old men, of a kindly and genial nature, such as his was, towards the children of others. The doctor, until old enough to go away to school, lived a near neighbor of the testator, and they were "boys" together, the young and the old, they went fishing and hunting together, rode together, and spent much time in each other's society, the testator referred to him as "my boy," and the doctor called him "Uncle John." This friendship continued down to the time of testator's death, although while the former was away at school and practicing his profession in New York City they met but seldom. About three years before testator's death the doctor returned with his wife to East Greenbush to live; and then the old intimate relation was resumed; and the testator was a frequent and informal visitor at the doctor's house. He then first met the doctor's wife. Considerable evidence was given pro and con as to declarations of testator as to how he was intending to leave his property, and he seemed, if the witnesses are to be believed, that he made many conflicting statements; but the fact remains undisputed that in June, 1883, he made a will giving all of his estate to his sister Margaret, except a legacy of $1,000 to his nephew John K. Vosburgh, which will remained unrevoked until June 3d last, when he made another will. When testator was stricken with his last illness there was no one at his home to care for him except his said sister Margaret, and Jane Briss, the servant, and the doctor and his wife came and took charge, and they spent much of their time there from the day after he fell sick until his death. The former had exclusive charge of the case as testator's physician, except as he called in Dr. Hailes for a visit on June 3d, and Dr. Woodward on the 5th, as counsel. It was he who summoned the lawyer who drew this will, as well as the one made on June 3d. He also, on both occasions, summoned Mr. Grey, the executor, and to both wills his hired man was a subscribing witness. The sister Margaret was in the house all the time, and Mrs. Miller was also there a considerable part of the time covered by his illness; but it does not appear that either was consulted, or that the latter had any knowledge that her brother had made a will, or was contemplating any such act, although Margaret did, but she was not consulted, nor did she interfere, but allowed matters to take their own course. The attending physician and his wife seemed to have assumed control of the situation from the start, and maintained it to the end, independent of the sisters of the testator, who seemed to

have occupied the position of passive acquiescence therein. Neither was present when either of these wills were executed or being prepared, several of the neighboring farmers called to inquire as to testator's condition, some were allowed to see him, and others were denied; but it does not appear that any of them or any other person knew that testator had made a will, or that he intended to do so, save those either in whose favor they were drawn, or the parties brought in by the doctor to attend the execution thereof. The evidence leads irresistibly to the conclusion that there was an air of secrecy surrounding both of these transactions, and that all knowledge was confined within the limits of the little circle above mentioned. There is no reliable evidence of any particular act or attempt on the part of any one connected with the case to influence testator's mind as to the disposition of his property, but the opportunity was present. On Friday night, June 3d, the testator executed a will. This was probably because of the advice given him that day by Dr. Hailes. It was either the first or second day after he was taken sick, and there is little, if any, doubt as to his testamentary capacity at that time. He was in full possession of his mind, and he gave intelligent and explicit directions as to what he wanted, and as to what he did not want, done. The lawyer who drew the will says:

"Mr. Keefe said that he had caught a bad cold, but that he thought he would be around in a few days, but to make it certain he wanted his farm to go to Mrs. Dr. P. He asked me if I could make a will devising his real estate, and say nothing in regard to his personal property, and I told him that I could, and that he would die intestate as to the rest of his estate, and I drew the will with that understanding."

Again:

"He told me he wanted to make certain that he should have that farm, and that, after he got around,—he would be out in a few days,—he would have me prepare another will."

There is no intimation as to what his intention was at that time in case he made another will. It is quite evident that he did not intend to give the doctor's wife more than the farm, or he would have done so while he was in the act of making provision for her. It is much more probable that he had in mind his unmarried and dependent sister Margaret, to whom, by the will made in 1883, he had given his entire estate, except the legacy aforesaid of $1,000 to his nephew. In such a case as this the law presumes undue influence, and the burden of showing its absence rests upon those who are benefited to the exclusion of the natural objects of testator's bounty. In Marx v. McGlynn, supra, the court, after referring to physical coercion, goes on to say:

"There is another kind of undue influence more common than that just referred to, and that is where the mind and the will of the testator has been overpowered and subjected to the will of another, so that, while the testator willingly and intelligently executed a will, yet it was really the will of another, induced by the overpowering influence exercised upon a weak or impaired mind. Such a will may be procured by working upon the fears or the hopes of a weak-minded person, by artful and cunning contrivances, by constant pressure, persuasion, and effort, so that the mind of the testator is not left free to act intelligently and understandingly. * * * There are certain cases in which the law indulges in the presumption that undue influence

has been used, and those cases are where a patient makes a will in favor of his physician, a client in favor of his lawyer, a ward in favor of his guardian, or any person in favor of his priest or religious adviser, or where other close confidential relationships exist. Such wills, when made to the exclusion of the natural objects of the testator's bounty, are viewed with great suspicion by the law, and some proof should be required besides the factum of the will before the will can be sustained."

So, also, in Re Smith, 95 N. Y. 522, the following language is used:

"Taking all the circumstances together, the fiduciary relation, the change of testamentary intention, the age, the mental and physical condition of the decedent, the fact that the proponent was the draftsman and principal beneficiary under the will, and took an active part in procuring its execution, and that the testatrix acted without independent advice, a case was made which required explanation, and which imposed upon the proponent the burden of satisfying the court that the will was the free, untrammeled, and intelligent expression of the wishes and intention of the testatrix."

Leaving Mrs. Miller and the nephew and niece out of consideration, the case is utterly barren of explanation why he made no adequate provision for his sister Margaret, the daily companion of his lifetime, and preferred to her, in her necessity and old age, strangers of blood, however much he may have thought of them as friends, and especially is this true when is considered the provision he had made by the will of June 3d. His first and highest duty was to care for her, and that he did not do so is a circumstance in itself of so suspicious a character as to discredit this will, and force the conclusion that he was under some influence which warped him from the course he would naturally, and if left to himself, have taken. It is true that she does not appear in this case as a contestant; but what she may do or not do has no bearing on the question as to what the law recognizes her brother would have naturally done. It was not necessary that she should join in the petition herein. Any person interested had the right to institute the proceeding, and, if successful, it is for the benefit of all; but it does not matter, for Mrs. Miller, the petitioner, although not standing in as strong a position as Margaret, is entitled to consideration, and the same is true of the nephew and niece, to the former of whom he, as has been said, gave a legacy of $1,000 in 1883, and there is nothing to show any change in the relation between testator and him since then.

Let a decree be prepared revoking the probate of the will in question so far as the personal property of the testator is concerned. Decreed accordingly.

---

(27 Misc. Rep. 626.)

In re GIHON'S WILL.

(Surrogate's Court, Westchester County. April, 1899.)

EXECUTORS—APPOINTMENT.

